UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAURICE WATTS,

                      Plaintiff,

         -v-

AMAZON STUDIOS, LLC, *et al.*,

                    Defendants.

25-CV-8642 (JPO)

MEMORANDUM AND ORDER

J. PAUL OETKEN, District Judge:

      Plaintiff Maurice Watts brings this action against Amazon Studios LLC, Paramount

Television Studios LLC, and Does 1-10 (together, "Defendants"), asserting claims of trademark

infringement under 15 U.S.C. § 1114, false designation of origin under 15 U.S.C. § 1125(a),

trademark dilution under 15 U.S.C. § 1125(c), common law trademark infringement under New

York law, and unfair competition under New York law.  (*See generally* ECF No. 1 ("Compl.").)

Now before the Court is Defendants' motion to dismiss Watts's complaint.  (ECF No. 13.)  For

the reasons that follow, the Court grants the motion as to Watts's Lanham Act claims and

dismisses Watts's state law claims without prejudice to refiling in state court.

## I.      Factual Background and Procedural History

      The following facts are taken from Watts's complaint, as well as materials cited or relied

upon for the facts pleaded therein, and are presumed true for the purposes of this motion.  *See*

*Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

      Watts is a New York-based radio personality who has hosted and produced a radio

program called "The Love Zone" since the early 1980s.  (Compl. ¶¶ 7, 15.)  "The Love Zone" is

a federally registered trademark, is closely associated with Watts's signature baritone voice, and

1

has "developed substantial goodwill and secondary meaning, especially within Black American communities and the broader listening public." (*Id.* ¶¶ 16-17.)

On or about November 14, 2024, Defendants released an episode of the show *Cross* on the streaming platform Amazon Prime Video that included a scene featuring a radio program called "The Love Zone." (*Id.* ¶ 18.)  The scene, which lasts approximately six and a half minutes, shows the protagonist, Alex Cross, arriving home from work to the sounds of a radio program.  (ECF No. 16 ("Exhibit 1")[1] at 25:56-26:37.)  The radio personality, fictionally named "Vaughn Pope," says in a deep baritone voice, "Welcome to 'The Love Zone,'" and invites listeners to call in to the program with song requests.  (*Id.* at 26:38-27:06.)  Cross calls in to the show and tells the host that he and his late wife used to listen to The Love Zone before she passed away, and that it would have been their anniversary that day.  After a brief conversation with Pope, Cross requests a song.  (*Id.* at 27:07-30:20.)

Defendants never obtained a license or permission to use the name "The Love Zone" in the TV show.  (Compl. ¶ 19.)  After the episode was released, listeners of Watts's radio program and other members of the public contacted Watts, congratulating him on his "Amazon/Paramount deal."  (*Id.* ¶ 21; ECF No. 1-3.)  Watts filed suit on October 18, 2025.  (ECF No. 1.)  Defendants moved to dismiss his complaint on December 17, 2025 (ECF No. 13) and filed a memorandum of law in support (ECF No. 14 ("Mem.")).  Watts filed his opposition

---

[1] Defendants append to their motion to dismiss a flash drive containing the *Cross* episode at issue in this case.  (*See* ECF No. 16.)  Although the episode itself was not attached to Watts's complaint, the Court considers it in evaluating the motion to dismiss, since the complaint "relies heavily upon its terms and effect, thereby rendering the [video] integral to the complaint," and there is no dispute as to its "authenticity or accuracy."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quotation marks omitted).

to the motion on January 7, 2026 (ECF No. 20 ("Opp.")), and Defendants filed their reply on January 21, 2026 (ECF No. 24 ("Reply")).

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In ruling on a motion to dismiss, the Court must accept the plaintiff's factual allegations as true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). Nonetheless, the Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## III.    Discussion

### A.    Lanham Act Claims

Watts brings three claims under the Lanham Act premised on the *Cross* episode's mention of "The Love Zone": trademark infringement (15 U.S.C. § 1114), false designation of origin (15 U.S.C. § 1125(a)), and trademark dilution (15 U.S.C. § 1125(c)). In response, Defendants contend that these claims fail as a matter of law under *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).

In *Rogers*, the Second Circuit "establish[ed] a new test for trademark infringement claims where the use of a trademark has both expressive and commercial components." *Stewart Surfboards, Inc. v. Disney Book Grp., LLC*, No. 10-CV-2982, 2011 WL 12877019, at *3 (C.D.

Cal. May 11, 2011).  Specifically, the *Rogers* court held that the Lanham Act "appl[ies] to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression."  875 F.2d at 999.  To reify this principle, the Second Circuit outlined a two-pronged balancing test, under which the Lanham Act does not apply to allegedly infringing uses of a trademark in artistic work unless "the [name or likeness] has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the [name or likeness] explicitly misleads as to the source or the content of the work."  *Id.*; *see also Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 494-95 (2d Cir. 1989) (holding that, although *Rogers* itself was about a potentially misleading movie title, "the *Rogers* balancing approach is generally applicable to Lanham Act claims against works of artistic expression").

The first prong of the *Rogers* test—whether the name or likeness has any artistic relevance to the underlying work—is not difficult to meet.  "The threshold for 'artistic relevance' is purposely low and will be satisfied unless the use 'has *no* artistic relevance to the underlying work *whatsoever*.'"  *Louis Vuitton Malletier S.A. v. Warner Bros. Entertainment Inc.*, 868 F. Supp. 2d 172, 178 (S.D.N.Y. 2012) (quoting *Rogers*, 875 F.2d at 999); *see also E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008) (holding that, under *Rogers*, "the level of relevance merely must be above zero").  Here, no party disputes that The Love Zone has artistic relevance to the *Cross* episode.  Watts himself observes that the radio show is used "as an emotional anchor for the protagonist's marriage and grief."  (Opp. at 11-12.)  And as the scene makes clear, the atmospherically laid-back and romantic nature of The Love Zone recalls Cross's memories of listening to the show with his late wife while "cuddle[d] up on the couch," thereby creating a moment of emotional resonance for the character.  (Exhibit

4

1 at 28:20-28:49.)  Because The Love Zone was "not arbitrarily chosen just to exploit the publicity value of [the plaintiff's mark] but instead ha[d] genuine relevance to the film's story," the first prong of the *Rogers* test is satisfied.  *Rogers*, 875 F.2d at 1001.

The question is therefore whether the scene's reference to The Love Zone "explicitly misleads as to the source or the content of the work."  *Id.* at 999.  This second prong asks "whether the [name or likeness] is misleading in the sense that it induces members of the public to believe the [work] was prepared or otherwise authorized by" the plaintiff.  *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993).  "This determination must be made, in the first instance, by application of the venerable *Polaroid* factors," and "the finding of likelihood of confusion must be particularly compelling to outweigh the First Amendment interest recognized in *Rogers*."  *Id.*  Moreover, "[w]hen the infringing use is a fictional product or service shown or referenced in a work of fiction, the relevant product for the purpose of comparison to the senior use is the work of fiction itself rather than the fictional product or service depicted within that work."  *JTH Tax LLC v. AMC Networks Inc.*, 694 F. Supp. 3d 315, 336 (S.D.N.Y. 2023) (collecting cases).  In other words, the proper comparison for assessing the likelihood of confusion is drawn between Watts's radio program, The Love Zone, and the *Cross* episode as a whole, rather than the radio program referenced therein.

The eight non-exhaustive *Polaroid* factors are:

(1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may bridge the gap by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Souza v. Exotic Island Enterprises, Inc.*, 68 F.4th 99, 110 (2d Cir. 2023) (quotation marks omitted).  Here, the *Polaroid* factors weigh in Defendants' favor.  First, though Watts alleges

cursorily that The Love Zone has acquired "substantial goodwill and secondary meaning" in the public (Compl. ¶ 16), Defendants dispute the strength of the trademark (Mem. at 17 n.5). Because resolution of this dispute depends on questions of fact, however, the Court finds this factor to be neutral. Second, Watts utilizes the trademark for a distinctly different purpose in the marketplace (to advertise and brand his radio program) than does the *Cross* episode (to create a scene of emotional resonance for viewers of the *Cross* TV series). *Cf. JTH Tax*, 694 F. Supp. 3d at 337 (concluding that two marks were dissimilar under *Polaroid* because, while the plaintiff used the mark "to provide tax services, [] Defendants' purpose is to create an entertaining TV show"); *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 481 (S.D.N.Y. 2020) ("Plaintiff's purpose in using its mark is to sell vehicles to militaries, while Defendants' purpose is to create realistically simulating modern warfare video games for purchase by consumers."). The two marks are therefore dissimilar under the second *Polaroid* factor, which weighs in Defendants' favor.

Third, Watts does not allege in his complaint that his radio program and the *Cross* series compete, although he states summarily in his opposition that "[t]he context [of the marks]—mass-market streaming distribution—reaches the very audience likely to assume licensing for branded content." (Opp. at 21.) Because competitive proximity is a fact-intensive inquiry, however, the Court reserves judgment on this question and deems the third factor to be neutral. Fourth, the complaint does not allege, and presents no plausible basis to believe, that Watts plans to "bridge the gap" by entering Defendants' market and writing scripted TV dramas. *See Down to Earth Organics, LLC v. Efron*, No. 22-CV-06218, 2024 WL 1376532, at *8 (S.D.N.Y. Mar. 31, 2024). This factor therefore tips in Defendants' favor.

Fifth, Watts attaches to his complaint letters and text messages from friends who saw the *Cross* episode and thought that Watts had partnered with the TV show. (*See* ECF No. 1-3.) At this stage, presented with these attachments, the Court accepts as true Watts's allegation that the reference in *Cross* to The Love Zone resulted in some actual consumer confusion, which weighs in Watts's favor. The remaining factors, however, all weigh in favor of Defendants. Although Watts states in conclusory fashion that Defendants used his mark "in bad faith" (Compl. ¶ 42), he makes no allegations supporting an inference of bad faith. Moreover, because of the dissimilarity between Watts's radio program and the TV episode, there is no plausible basis to argue that the *Cross* episode will harm Watts's radio program in the minds of consumers by being an "inferior product" with the same name. *Cf. JTH Tax*, 694 F. Supp. 3d at 340. The eighth and final factor also tips in favor of Defendants: Although Watts's radio program shares the same name as the radio program referenced in the *Cross* episode, "moviegoers are sophisticated enough to know that the mere presence of a brand name in a film, especially one that is briefly and intermittently shown, does not indicate that the brand sponsored the movie[.]" *Louis Vuitton Malletier S.A.*, 868 F. Supp. 2d at 184 n.19. This is especially so where, as here, the radio program in the episode is set in a different city (Washington, D.C.), with a different host (Vaughn Pope), and in a different format (call-in requests) than Watts's radio program.

The *Polaroid* factors demonstrate—and common sense dictates—that *Rogers* precludes Watts's Lanham Act claims. Construed in the light most favorable to Watts, the complaint alleges that a *Cross* episode's use of the name "The Love Zone" to reference a radio program in one scene caused some actual confusion among some of Watts's friends and listeners. This is not sufficient to show, however, that the reference "explicitly misleads as to the source or the content of the work." *Rogers*, 875 F.2d at 999. Indeed, "*Rogers* teaches that mark owners must

accept 'some' confusion when outweighed by free speech interests." *Louis Vuitton Malletier S.A.*, 868 F. Supp. 2d at 184 n.19 (quoting *Rogers*, 875 F.2d at 1001). Instead, "[o]nly a 'particularly compelling' finding of likelihood of confusion can overcome the First Amendment interests." *Id.* at 179 (quoting *Twin Peaks*, 996 F.2d at 1379). Given the obvious dissimilarities between Watts's radio program and the *Cross* episode, as laid out in the *Polaroid* analysis above, Watts has not met this heightened burden.

Watts lodges two objections to this conclusion. First, he argues that *Rogers* is inapplicable to his case under *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140 (2023). (Opp. at 11-16.) In *Jack Daniel's*, the whiskey manufacturer sued another company for producing dog toys designed to look like bottles of Jack Daniel's whiskey and emblazoned with the name "Bad Spaniels." 599 U.S. at 144, 148-49. Because the "Bad Spaniels" toy used Jack Daniel's trademark "as a trademark—meaning [] as a source identifier—rather than for some other expressive function," the Court concluded that the *Rogers* test did not apply. *Id.* at 157. It is clear from the *Cross* episode, however, that it refers to The Love Zone not "as a designation of source for the infringer's own goods," "but solely to perform some other expressive function" within the episode—namely, to invoke a fictional radio program that would reflect the protagonist's grief. *Id.* at 153-54. And as the *Jack Daniel's* court observed as to other expressive uses of a trademark, "a consumer would no more think that [the song 'Barbie Girl'] was produced by Mattel than would, upon hearing Janis Joplin croon 'Oh Lord, won't you buy me a Mercedes Benz?,' suspect that she and the carmaker had entered into a joint venture." *Id.* at 154 (cleaned up). It similarly strains credulity to think that the *Cross* episode's passing reference to The Love Zone—a fictional show set in a different city, with a different host, and in

8

a different format than Watts's program—would be understood by a significant number of consumers to suggest that Watts had endorsed, or was involved in, production of the TV show.

Second, Watts contends that the *Rogers* balancing test cannot be evaluated on a motion to dismiss, since "[t]he *Polaroid* factors comprise a fact-intensive balancing test that is ordinarily ill-suited for resolution on a motion to dismiss." (Opp. at 19.)  It is true that several of the *Polaroid* factors go to questions of fact.  But "[i]n the context of a motion to dismiss, courts have disposed of trademark claims where simply looking at the work itself, and the context in which it appears, demonstrates how implausible it is that a viewer will be confused into believing that the plaintiff endorsed the defendant's work." *Louis Vuitton Malletier S.A.*, 868 F. Supp. 2d at 183 (collecting cases); *see also Down to Earth Organics*, 2024 WL 1376532, at *9 ("Contrary to Plaintiff's assertions, the *Rogers* test and *Polaroid* factors may appropriately be applied on a motion to dismiss, particularly where the court is satisfied that the products or marks are so dissimilar that no question of fact is presented." (quotation marks omitted)).  The same is true here.  Watts's complaint, viewed alongside the *Cross* episode itself, simply does not raise a plausible inference that viewers would be misled into thinking that Watts had endorsed the *Cross* TV series, at least to such an extent that "the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Rogers*, 875 F.2d at 999.

Accordingly, Watts's Lanham Act claims are dismissed for failure to state a claim.

## IV.    State Law Claims

Watts also asserts claims of trademark infringement and unfair competition under New York law.  (Compl. ¶¶ 39, 43.)  Because the Court has dismissed Watts's federal claims, however, it must now decide whether to exercise supplemental jurisdiction over these state claims.  A district court "may decline to exercise supplemental jurisdiction over [a pendent state law claim] if . . . the district court has dismissed all claims over which it has original

jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also In re Merrill Lynch Limited Partnerships Litigation*, 154 F.3d 56, 61 (2d Cir.1998) (per curiam) (concluding that district courts should decline to exercise supplemental jurisdiction over state law claims when all federal claims have been dismissed).

Given this case law, the Court declines to exercise supplemental jurisdiction over Watts's New York trademark infringement and unfair competition claims. Accordingly, those state law claims are dismissed without prejudice to refiling in state court.

## V.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss Watts's complaint is GRANTED as to Watts's federal Lanham Act claims, and those claims are dismissed with prejudice. Watts's state law claims are dismissed without prejudice to refiling in state court. The Clerk of Court is directed to terminate the motion at ECF Number 13, to enter judgment of dismissal, and to close this case.

SO ORDERED.

Dated: June 9, 2026
       New York, New York

_____
J. PAUL OETKEN
United States District Judge

10